## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KELLEY PAYNE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES STEEL CORPORATION, MARIO LONGHI FILHO, and DAVID B. BURRITT,<br><br>Defendants. | )<br>)<br>)  **Case No.**<br>)<br>)<br>)<br>)  **CLASS ACTION COMPLAINT**<br>)<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT

Plaintiff Kelley Payne ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to itself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding United States Steel Corporation ("U.S. Steel" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired securities of U.S. Steel between November 1, 2016 and April 25, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe. An integrated steel producer uses iron ore and coke as primary raw materials for steel production. U.S. Steel has annual raw steel production capability of 22 million net tons (17 million tons in the United States and 5 million tons in Europe). U.S. Steel supplies customers throughout the world primarily in the automotive, consumer, industrial, and oil country tubular goods markets. U.S. Steel was the twenty-fourth largest steel producer in the world in 2015. Also in 2015, according to publicly available information, U.S. Steel was the third largest steel producer in the United States. U.S. Steel is also engaged in other business activities consisting primarily of railroad services and real estate operations.

3.      Founded in 1901, the Company is headquartered in Pittsburgh, Pennsylvania. U.S. Steel's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "X".

4.      In 2013, U.S. Steel launched a "transformational process called the 'Carnegie Way,'" named after U.S. Steel co-founder Andrew Carnegie. The Company told investors that

2

the Carnegie Way was a "strategic, disciplined approach to transforming the Company to address the new realities of the marketplace."

5.    During 2016, U.S. Steel told investors it was transforming the Company through "the two phases of a focused execution on [its] stockholder value creation strategy." As part of the Carnegie Way, the strategy had two parts: "(1) earn the right to grow, and (2) drive and sustain profitable growth." The Company stated that its "long-term success depends on [its] ability to execute these phases and earn an economic profit across the business cycle." Defendants stated they were "working towards strengthening our balance sheet, with a strong focus on cash flow, liquidity, and financial flexibility." Based on the Carnegie Way philosophy, U.S. Steel "launched a series of initiatives" to "add value, re-shape the Company, and improve [its] performance across [its] core business processes, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support." The Company told investors it was "on a mission to become an iconic industry leader" by creating "a sustainable competitive advantage with a relentless focus on economic profit, our customers, cost structure, and innovation." U.S. Steel stated that achieving its goals required "exemplary leadership and collaboration of all employees."

6.    To that end, in the Company's annual report for 2016, filed with the SEC on February 28, 2017 ("2016 10-K"), U.S. Steel pointed to $745 million of Carnegie Way benefits realized in 2016 as a sign of "significant progress toward our goal of achieving economic profit across the business cycle." Labeling the progress as "real" and "substantial," U.S. Steel told investors that it was "not yet enough to fully overcome unfavorable market and business conditions." The 2016 10-K stated that ***"[t]he Carnegie Way has already driven a shift in the***

*Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery."* (Emphasis added.)

7.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) while the Company was implementing its Carnegie Way program, it was focused on cutting costs and was not making investments necessary to position U.S. Steel so that it could respond to improved market conditions; (ii) Defendants' failure to invest in improving capital assets during the industry downturn, in order to report apparent financial improvements, meant that U.S. Steel had higher production costs than its competitors, even in the face of improved pricing, which would negatively impact its financial results; and (iii) Defendants were forestalling expensive capital equipment upgrades in order to boost the Company's short-term financial results at the expense of long-term financial performance, leaving U.S. Steel in need of accelerated, costly equipment upgrades that would leave the Company years away from generating improved financial performance; and (iv) as a result of the foregoing, U.S. Steel's public statements were materially false and misleading at all relevant times.

8.      During the Class Period, steel market conditions improved substantially. Indeed, in the first quarter of 2017, the average price of U.S. hot-rolled steel coil, a benchmark product used in a variety of products ranging from bridges to microwaves, rose 55% from a year earlier, helped by successful U.S. trade cases against foreign imports. By all accounts, U.S. Steel appeared primed to pounce on the domestic steel market turnaround.

9.      After the market closed on April 25, 2017, however, the Company reported what analysts labeled "hard-to-fathom" and "abysmal" financial results, as U.S. Steel revealed

shortcomings that, according to Bloomberg, "choked earnings even as prices of the metal surged." Specifically, the Company reported a net loss of $180 million, or negative $1.03 per diluted share, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA") of $74 million. The Company's earnings release revealed negative operating cash flow of $135 million, a significant decline in the Company's Flat-Rolled segment, and a reduced 2017 outlook that widely missed analyst expectations, including a *35% reduction* to 2017 EBITDA guidance. 2017 guidance was worse at the earnings level, where guidance was *cut 50%* from $3.08 per share to $1.50. The $1.50 earnings per share ("EPS"), however, included the benefit of an accounting change that cut $175 million from operating costs. Factoring that positive accounting change out of the mix, the Company's adjusted EPS guidance was closer to $0.85, a cut of approximately 72%. The Company also eliminated language about being "cash positive" for the year.

10.    The Company's earnings release quoted Chief Executive Officer ("CEO") Mario Longhi ("Longhi") as stating, in part, that *"operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions."* Longhi also added that U.S. Steel would "not let favorable near-term business conditions distract us from taking the *outages we need to revitalize our assets* in order to achieve more reliable and consistent operations, improve quality and cost performance, and generate more consistent financial results." He also added that U.S. Steel "made the strategic decision to accelerate [its] efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability." During a conference call before the market opened on April 26, 2017, Longhi stated that in 2017 the Company would "be taking more downtime at our facilities, which will limit our steel production volumes." (Emphasis added.)

11.     On this news, U.S. Steel's share price fell $8.33, or 26.78%, to close at $22.78 on April 26, 2017.

12.     Analysts responded negatively as well. For example:

a) an Axiom analyst stated that if things are so bad during good times, the remainder of the Company's results in 2017 were "set to resemble a 'Nightmare on Elm Street'";

b) Jefferies stated that operational issues and myriad other headwinds pressured flat rolled results, which drove the "abysmal results";

c) Morgan Stanley called the reasons behind the Company's guidance cut unclear and stated that it was struggling to understand how U.S. Steel's costs moved up so much in the first quarter 2017;

d) KeyBanc stated that U.S. Steel's results were not an indictment on steel industry fundamentals, saying they appeared to be Company-specific;

e) BMO stated that the magnitude of the Company's earnings miss highlighted underlying unprecedented earnings volatility for U.S. Steel, even when compared to its high-beta steel making peers, and stated that U.S. Steel was now positioned as a company with meaningfully lower profitability, higher capital spending, and limited exposure to price swings; and

f) Macquarie Group stated the magnitude of the 2017 EPS guidance cut was even larger than first apparent because the new guidance of $1.50 included a previously outlined $0.60 gain from lower operating expenses, due to new accounting policies. Therefore, the adjusted EPS guidance for 2017 would actually be only $0.90.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). U.S. Steel's principal executive offices are located within this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, acquired U.S. Steel securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant U.S. Steel is incorporated in Delaware.  The Company's principal executive offices are located at 800 Grant Street, Pittsburgh, Pennsylvania.  U.S. Steel's common stock trades on the NYSE under the ticker symbol "X".

20.    Defendant Mario Longhi ("Longhi") has served at all relevant times as the Company's Chief Executive Officer and Director.  Prior to February 28, 2017, Longhi also served as the Company's President.

21.    Defendant David B. Burritt ("Burritt") has served as Company's President and Chief Operating Officer since February 28, 2017. Prior to that, Burritt was the Company's Executive Vice President and Chief Financial Officer ("CFO"). Burritt currently has executive responsibility for all aspects of the Company's day-to-day business in the United States and Central Europe, and has continued to serve as CFO while the Company undertakes a search to fill that role.

22.    The defendants referenced above in ¶¶ 20-21 are sometimes referred to herein as the "Individual Defendants."

23.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of U.S. Steel's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe. An integrated steel producer uses iron ore and coke as primary raw materials for steel production. U.S. Steel has annual raw steel production capability of 22 million net tons (17 million tons in the United States and 5 million tons in Europe). U.S. Steel supplies customers throughout the world primarily in the automotive, consumer, industrial, and oil country tubular goods markets. U.S. Steel was the twenty-fourth largest steel producer in the world in 2015. Also in 2015, according to publicly available information, U.S. Steel was the third largest steel producer in the United States. U.S. Steel is also engaged in other business activities consisting primarily of railroad services and real estate operations.

### Materially False and Misleading Statements Issued During the Class Period

25.     The Class Period begins on November 1, 2016, when the Company reported its third quarter 2016 ("3Q2016") financial results. The Company reported net earnings of $51 million, or $0.32 per diluted share, and operating cash flow of $264 million, representing a significant turnaround from the third quarter 2015, when the Company reported a net loss of $173 million and a $1.18 loss per diluted share, as well as the second quarter 2016, when the Company reported a net loss of $46 million, or $0.32 loss per diluted share. The earnings release stated, in part:

> Third quarter results for our Flat-Rolled segment improved from the second quarter as both spot and contract prices increased, and ***benefits from an improving product mix and our Carnegie Way initiatives continued to grow. Operational issues adversely impacted shipments from our Flat-Rolled facilities. In the last half of the third quarter, we experienced unplanned outages at several of our steelmaking and finishing facilities.*** Our third quarter

shipments were negatively impacted by approximately 125,000 tons as a result of unplanned outages, as *our streamlined plant operating configuration extends the time it takes to recover volumes from unplanned outages.* A planned outage and lower operating rates at our mining operations also negatively impacted our results.

(Emphasis added.)

26.    Commenting on U.S. Steel's results, the release included the following statements from Longhi:

Our third quarter results improved significantly from the second quarter as each of our segments improved, resulting in our highest quarterly segment income since the fourth quarter of 2014. *We faced some operational challenges that limited our ability to realize the full benefits of an improved pricing environment, but we continued to make progress in our Carnegie Way transformation efforts. With our very strong cash and liquidity position, we remain focused on the investments that we need to continue to make to revitalize our facilities and deliver value-enhancing solutions for our customers.*

As we move through the rest of 2016, operational issues remain a headwind for us, as we continue to recover from unplanned outages in the third quarter, while also completing our planned maintenance outages. *We have identified the critical assets that require additional capital investment and increased maintenance spending in order to improve our reliability and quality, and to lower our costs. We plan to use our strong cash and liquidity position to expedite the revitalization of our facilities and to fund additional growth projects. This will enhance the ongoing development of the differentiated solutions that make us a strategic business partner for our customers. We continue to make progress on our Carnegie Way transformation, and we have many opportunities ahead of us.*

(Emphasis added.)

27.    On November 2, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter ended September 30, 2016 ("3Q2016 10-Q"). The quarterly report reiterated the financial results from the November 1, 2016 news release and included Sarbanes Oxley ("SOX") certifications signed by Longhi and Burritt stating, among other things, that the quarterly report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading with respect to the period covered by this report."

The 3Q2016 10-Q also stated, in relevant part:

> Net sales were $2,686 million in the three months ended September 30, 2016, compared with $2,830 million in the same period last year. ***The decrease in sales for the Flat-Rolled segment primarily reflected decreased shipments (decrease of 141 thousand net tons) due to operational issues across our Flat-Rolled facilities. In the last half of the third quarter of 2016 we experienced unplanned outages at several of our steelmaking and finishing facilities and our current operating configuration in 2016 extends the time it takes to recover volumes from unplanned outages.*** Additionally, sales in our Flat-Rolled segment decreased due to reduced coke and iron ore pellet sales to U. S. Steel Canada Inc. These decreases were partially offset by higher average realized prices (increase of $44 per net ton) due to improved spot market prices.

(Emphasis added.)

28.    Also on November 2, 2016, the Company held a conference call to discuss its 3Q2016 financial results. Longhi, Burritt, and Dan Lesnak ("Lesnak"), the Company's General Manager of Investor Relations, participated in the call on behalf of the Company. Longhi made the following opening statements, in relevant part:

> We continue to make significant progress on improving our business model, lowering our breakeven point, improving our already industry-leading safety performance, and strengthening our balance sheet. We have faced and continue to face many challenges, some at the Company level and some at the industry level. At the Company level, we have streamlined our operating configuration, including the temporary idling of facilities to create greater production efficiencies under today's market conditions and have made many hard decisions to permanently address unprofitable businesses and facilities with a final resolution of our former operations in Canada now within our sights.
>
> ***
>
> ***We are accelerating our investments in our facilities to achieve sustainably better and more consistent operating performance including improved reliability, quality, delivery, and customer service. Innovation in both products and processes is the foundation for our future success.***

(Emphasis added.)

29.    Later in the call, Longhi fielded a number of questions from analysts about the Company's Carnegie Way initiative. In one exchange, Longhi assured an analyst that the Company was not underspending on the capital side as a result of Carnegie Way, and instead was "investing appropriately and making sure that everything we know is being addressed." Specifically, Longhi stated, in relevant part:

> Sure. First and foremost, thanks for describing the nature of what we are doing here as a journey because it truly is, *and I would offer that no, we have not been under spending. What we have been doing is—we've only been able to accomplish what we have accomplished and gotten to the position that we are because we have been investing appropriately and making sure that everything we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events. So we've been able to get to this point because we've been doing all of the right things.* The reality, though, is as we go into a different mix and we begin to operate under much more tight conditions, every single thing that impacts, we don't have the capacity to more quickly—to recover.

(Emphasis added.)

30.    Separately, when asked about maintenance spending in 2016 and 2017, Longhi and Lesnak confirmed that the Company was not cutting back maintenance spending on its U.S. FlatRolled facilities, and in fact was spending more on those facilities:

> **Longhi:** Yes. Dan [Lesnak] has been working with the folks to get—we are in the planning phase right now, but if you look at some of the levels of operations that we've had this year compared to history, we certainly have a much more streamlined footprint with changes of nature in which how much money you've spent. But as we learn more about the opportunities that we have to continue to improve faster, we are going to be allocating. *Now we do have a much better comfortable position to go address it in a better and faster manner, which will certainly increase or pro rata to what we have been doing before.* And Dan is going to be in a position to provide a little more clarity on that as we go forward.
>
> **Lesnak:** I would just say that we did say we are going to spend more in 4Q to accelerate the improvements in the facilities. That will bring us year over year pretty consistent with last year, and to Mario's point, we have a lot less facilities than we did last year. *So I think if you think about maintenance actually on a per ton of capacity that is running, we are actually spending more on our facilities this year than we did last year so I think we are doing a pretty good job*

*of addressing some challenges. We are not cutting back; we are getting things done a little bit faster now.*

(Emphasis added.)

31.    Later in the call, Longhi emphasized "very significant levels of improvement" the

Company had realized from Carnegie Way while downplaying operational issues:

> We've had a quarter where some of the efforts had to be diverted a little bit to make sure that we addressed the unforeseen challenges that came our way. But in spite of that, we still—I think we ended the quarter with more than 300 new initiatives being completed. And I think going into the next quarter, there are probably another 500 slated to be pursued. So in the pipeline, it is even much greater than that. So I wouldn't focus so much on the actual dollars that you saw coming out of this quarter. I think there is more to come. Eventually, these things will begin to taper off as we get closer to the point of—that we can achieve an incredibly higher level of competitive base from a cost perspective. And that is the ultimate goal of what we are relentlessly pursuing.
>
> **On the other hand, the Carnegie Way also in contrast has very significant levels of improvement on the overall value chain. You look at the amount of cash that we have been able to generate both from operations as well as the value chain and the logistics side of things.** We are talking here about some different types of innovations, and we just mentioned a couple of them here in packaging and automotive. **So this whole context is what the Carnegie Way encompasses. It is not just the cost**, and I think we are going to continue to show interesting results in both fronts.

(Emphasis added.)

32.    The Company also released a presentation dated November 1, 2016 with slides on

the Company's 3Q2016 financial results. Regarding Carnegie Way, the presentation stated, in

relevant part:

> **Our pace of progress on the Carnegie Way transformation continues to exceed our expectations. The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry.** With over 7,500 active projects, we have many opportunities ahead of us.
>
> ***
>
> Our Carnegie Way transformation is a true journey, not a sprint. However, we are more than two full years in and our progress continues to exceed expectations.

13

> ***The hard work of The Carnegie Way transformation is translating into stronger financial results and better performance for our investors, customers***, and employees. Our aspiration to become sustainably profitable, of earning economic profit across the cycle and being profitable across the trough remains unchanged, and The Carnegie Way is helping us get closer to that goal.

(Emphasis added.)

33.     The presentation also touted ***"[i]mproved results despite operating challenges"*** in the Flat-Rolled Segment. The improvements were attributed in part to "our Carnegie Way initiatives." Carnegie Way was also credited with ***"improving earnings power,"*** including the addition of $55 per ton of "Carnegie Way Benefits" to the EBITDA of the Flat-Rolled Segment.

34.     On January 31, 2017, the Company announced its full year 2016 results, reporting a full year net loss of $440 million, or $2.81 loss per diluted share, operating cash flow of $727 million, and full year adjusted EBITDA of $510 million. The Company also reported a fourth quarter 2016 ("4Q2016") net loss of $105 million, or $0.61 loss per diluted share, compared to fourth quarter 2015 net loss of $1.1 billion, or $7.74 loss per diluted share. The earnings release stated, in part:

> Fourth quarter results for our Flat-Rolled segment declined as compared with the third quarter primarily due to a decrease in average realized prices, fewer shipments, as well as increased outage spending. ***Planned outages as part of our previously announced asset revitalization process limited the amount of tons we could ship in the quarter. Full-year Flat-Rolled segment results for 2016 improved from 2015 largely due to lower raw material costs, lower spending, and benefits provided by our Carnegie Way efforts.*** These improvements were partially offset by lower average realized prices and shipments.

(Emphasis added.)

35.     Regarding the Company's guidance for 2017, the January 31, 2017 release stated, in part:

> ***If market conditions,*** which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, ***remain at their current levels***, we expect:

- ***2017 net earnings of approximately $535 million, or $3.08 per share, and EBITDA of approximately $1.3 billion;***
- ***Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016;***
- ***To be cash positive for the year, primarily due to improved cash from operations***; and
- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

*We believe market conditions will change, and as changes occur during the balance of 2017, our net earnings and EBITDA should change consistent with the pace and magnitude of changes in market conditions.*

(Emphasis added.)

36.    Commenting on the Company's results, the January 31, 2017 earnings release

quoted Longhi as stating:

*We entered 2016 facing very challenging market conditions, but remained focused on our Carnegie Way transformation efforts. Despite lower average realized prices and shipments in 2016, our results are better as we continued to improve our product mix and cost structure.* Our focus on cash, including better working capital management and opportunistic capital markets transactions, resulted in an improved debt maturity profile and stronger cash and liquidity. *We are well positioned to accelerate the revitalization of our assets to improve our operating reliability and efficiency, and deliver value-enhancing solutions to our customers.*

\*\*\*

*We are starting 2017 with much better market conditions than we faced at the beginning of 2016. Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and increased our customer focus. These substantive changes and improvements have increased our earnings power.* While we *will benefit from improved market conditions*, they continue to be volatile and we must remain focused on improving the things that we can control. Pursuing our safety objective of zero injuries, *improving our assets* and operating performance, and driving innovation that creates differentiated solutions for our customers *remain our top priorities.*

(Emphasis added.)

15

37.    The following day, February 1, 2017, the Company held a conference call to discuss its 4Q2016 and full year 2016 financial results. Longhi, Burritt, and Lesnak participated in the call on behalf of the Company. During his opening remarks, Longhi stated, in part:

> *The hard and competent work of the Carnegie Way transformation is translating into stronger financial results. And better performance for our investors, customers* and employees. *As we have demonstrated over the last couple of years, we have a robust process in place that has consistently generated benefits. Even during times of difficult market conditions.*

> \*\*\*

> We have given you regular updates on the significant progress we have made on improving our cost structure. And our increased focus on our customers through our commercial entities, which has resulted in the continuing improvement and our value added product mix. *We have also been investing our facilities as we indicated last quarter.* Increasing the base and magnitude of our efforts in this area is a priority for this year.

> \*\*\*

> Our Carnegie Way transformation efforts have improved our cost structure, streamlined our operating footprint, and increased our customer focus. *These substantial changes and improvements have increased our earnings power and while we will benefit from improved market conditions, they continue to be volatile.* We must remain focused on improving the things that we can control.

(Emphasis added.)

38.    Later in the call, defendants were asked "what volume improvement we might be able to anticipate in [the Flat-Rolled Segment] in 2017 under your current configuration? It was helpful you clarified that you're running, what, three blast furnaces." Longhi responded: *"Our blast furnace capacity is going to be capable of supplying whatever additional alternatives that we're going to find out there . . . . What we do anticipate is to be more reliable than we were so we can benefit from being able to roll more slabs."* Longhi added that he expected about 5% volume growth in 2017 compared to 2016. (Emphasis added.)

16

39.    When asked by another analyst about the Company's queue of potential capital projects, Longhi stated, in part:

> I think that, you know, *we see that there is a lot of value in continu[ing] to invest in our facilities and invest in our innovation. . . . It's a myriad of projects that we have under the Carnegie Way concept.* And it's not in the hundreds, it's in many cases in the thousands.

(Emphasis added.)

40.    The Company also released a presentation dated January 31, 2017 with slides on the Company's 4Q2016 and full year 2016 financial results. Regarding Carnegie Way, the presentation stated, in relevant part:

> *We are starting 2017 with much better market conditions than we faced at the beginning of 2016. Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and increased our customer focus. These substantive changes and improvements have increased our earnings power.*
>
> \*\*\*
>
> *Our pace of progress on the Carnegie Way transformation continues to exceed our expectations. The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry.* With over 4,000 active projects, we have many opportunities ahead of us.

(Emphasis added.)

41.    The presentation also credited Carnegie Way with "*improving earnings power*," including the addition of $55 per ton of "Carnegie Way Benefits" to the EBITDA of the Flat-Rolled Segment.

42.    On February 28, 2017, the Company filed with the SEC its 2016 10-K, which was signed by Longhi and Burritt, and included SOX certifications signed by each of them. The 2016 10-K reiterated the financial results outlined in the January 31, 2017 earnings release. Discussing the Company's operations, the 2016 10-K stated, in relevant part:

In 2013, U. S. Steel launched a transformational process called the "Carnegie Way," named after the famed American industrialist and U. S. Steel co-founder Andrew Carnegie. The Carnegie Way is a strategic, disciplined approach to transforming the Company to address the new realities of the marketplace. Through the Carnegie Way, we focus on our strengths and where we can create the most value for all U. S. Steel stakeholders, including our stockholders, employees, customers and suppliers. The Carnegie Way is a framework that helps employees address all aspects of our business and achieve sustainable improvements through process efficiencies and strategic investments. We have been working through a series of transformational initiatives that we believe will enable us to more effectively add value, respond to customer needs, get leaner faster, right-size our operations and improve our performance across our core business process capabilities, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support. Key accomplishments to date include a more intense focus on cash flow, a stronger balance sheet and a revised approach to how we view shipment volume and production. In pursuing our financial goals, we will not sacrifice our commitment to our core values of safety and environmental stewardship. We also recognize that achieving this goal requires exemplary leadership and collaboration among all employees, and we are committed to attracting, developing and retaining a workforce with the talent, skills and integrity needed for our long-term success. *The Carnegie Way has already driven a shift in the Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery.*

(Emphasis added.)

43.     The statements referenced in ¶¶ 25-42 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) while the Company was implementing its Carnegie Way program, it was focused on cutting costs and was not making investments necessary to position U.S. Steel so that it could respond to improved market conditions; (ii) Defendants' failure to invest in improving capital assets during the industry downturn, in order to report apparent financial improvements, meant that U.S. Steel had higher production costs than its competitors, even in the face of improved pricing, which would negatively impact its financial results; and (iii) Defendants were forestalling expensive

capital equipment upgrades in order to boost the Company's short-term financial results at the expense of long-term financial performance, leaving U.S. Steel in need of accelerated, costly equipment upgrades that would leave the Company years away from generating improved financial performance; and (iv) as a result of the foregoing, U.S. Steel's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

44.     After the market closed on April 25, 2017, the Company issued a release announcing its first quarter 2017 ("1Q2017") financial results, revealing worsening financial results despite improved market conditions. The release reported a surprising net loss of $180 million, or $1.03 loss per diluted share, adjusted EBITDA of $74 million, and negative operating cash flow of $135 million, which was "primarily associated with an investment in working capital in the quarter." The release also stated, in relevant part:

> First quarter results for our Flat-Rolled segment declined significantly compared with the fourth quarter, as we expected, primarily due to higher raw material costs, increased planned outage costs, seasonally lower results from our mining operations, and restart costs associated with the Granite City hot strip mill and our Keetac iron ore mine. Also contributing to the decline in results was a $20 million charge from using the last-in-first-out (LIFO) inventory method in the first quarter, while we recognized a $40 million LIFO benefit in the fourth quarter. These factors were only partially offset by higher average realized prices and benefits from slightly increased shipments that were limited by operating challenges at our facilities.

> First quarter results for our European segment improved compared with the fourth quarter due to increased average realized prices and a favorable first-in-first-out (FIFO) inventory impact. These benefits were partially offset by lower shipment volumes and higher raw material costs, particularly for coking coal and iron ore.

> First quarter results for our Tubular segment improved compared with the fourth quarter due to higher prices, increased shipments, lower spending and the absence of an unfavorable lower of cost or market adjustment for obsolete inventory taken in the fourth quarter. These benefits were partially offset by increased substrate costs.

45.    The April 25, 2017 earnings release also substantially reduced the Company's 2017 guidance, cutting earnings from $535 million to $260 million and eliminating prior language that the Company would be cash flow positive in 2017. The release stated, in relevant part:

> If market conditions, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, remain at their current levels, we expect:
>
> - 2017 net earnings of approximately $260 million, or $1.50 per share, and adjusted EBITDA of approximately $1.1 billion;
>
> - Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016; and
>
> - Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.
>
> We believe market conditions will change, and as changes occur during the balance of 2017, we expect these changes to be reflected in our net earnings and adjusted EBITDA.

46.    Quoting Longhi, the April 25, 2017 release included the following statements:

> While our segment results improved by over $200 million compared with the first quarter of 2016, *operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions.* However, we continue to be encouraged by the strength of our European business and we are also seeing improving energy markets. Overall, improved commercial conditions more than offset higher raw materials and energy costs and increased maintenance and outage spending driven by our asset revitalization efforts. *The execution of our asset revitalization program and the continued implementation of reliability centered maintenance practices are critical to achieving sustainable improvements in our operating performance and costs.* We have built the financial strength and resources to move forward more aggressively on these initiatives, and remain focused on providing the service and solutions that will create value for our stockholders, customers, employees, and other stakeholders.
>
> ***
>
> Market conditions have continued to improve, and we will realize greater benefits as these improved conditions are recognized more fully in our future results. We are focused on long-term and sustainable improvements in our business model that will position us to continue to be a strong business partner that creates value

for our customers. This remains a cyclical industry and we will not let favorable near-term business conditions distract us from taking the outages we need to revitalize our assets in order to achieve more reliable and consistent operations, improve quality and cost performance, and generate more consistent financial results. We issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion. As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan. We believe we can create more long-term and sustainable value by moving faster now. ***We have made the strategic decision to accelerate our efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability.*** We believe our objective to achieve economic profit across the business cycle will result in true value creation for all of our stakeholders over the long-term.

(Emphasis added.)

47.     Before the market opened the following day, April 26, 2017, the Company held a

conference call to discuss its 1Q2017 financial results. Longhi, Burritt, and Lesnak participated

in the call on behalf of the Company. During his opening remarks, Longhi stated in part:

Last quarter, we discussed the comprehensive asset revitalization plan we are implementing to improve our profitability and competitiveness and to meet or exceed the increasing expectations of our customers.

***This is a multiyear plan that will take 3 to 4 years till full implementation and is not just sustaining capital and maintenance spending.*** These projects will deliver both operational and commercial benefits. As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan.

We believe we can create more long term and sustainable value by moving faster now. ***And we have made a strategic decision to accelerate our efforts to address some of the issues and implement the improvements that will enhance our ability to achieve sustainable long-term profitability.***

***As a result of this acceleration, we now expect our investment in asset revitalization in 2017 to be approximately $300 million higher than it was in 2016. We will be taking more downtime at our facilities, which will limit our steel production volumes*** and with the restart of our Lone Star welded pipe mill, that I mentioned earlier, we'll resume shipping hot-rolled bands to our Tubular segment. ***Based on these factors, we will have fewer tons available to offer into the spot market after taking care of our strategic customers' requirements.***

21

We currently expect our flat-rolled shipments to third-party customers will be approximately 10 million tons this year.

(Emphasis added.)

48.    During the question-and-answer session that followed, defendants were asked whether the total cost of the accelerated revitalization plan would exceed $1 billion. Burritt responded:

> *It's more than that. But we were ramping up right now. . . . this is an investment year, but this is a rampup.* We're accelerating where we thought we do this year, we're still in a ramp-up phase. It takes a lot of advance engineering and planning for a lot of these projects. *So we would expect going forward that the numbers get bigger before they get smaller.*

(Emphasis added.)

49.    As the call continued, Burritt admitted that defendants needed to "do better" and "move faster" in revitalizing Company assets, stating, "[w]e need to perform" and "[w]e need to execute."

50.    On this news, U.S. Steel's share price fell $8.33, or 26.78%, to close at $22.78 on April 26, 2017.  The drop represented the largest one-day decline in the price of U.S. Steel stock since at least 1991.

51.    Analyzing the reasons behind the Company's poor performance, Bloomberg reported that:

> Longhi is paying the price of spending frugally on the company's blast furnaces during lean years when a flood of cheap Chinese imports kept prices low and forced producers to defend margins. The investment backlog means he's now unable to reap the rewards of a price recovery spurred by government restrictions on imports.
>
> The CEO may have focused too much on lobbying for trade cases to defend the U.S. steel industry and too little on improving operational efficiency, according to Gordon Johnson, an analyst at Axiom Capital Management.
>
> "They're structurally worse off than everyone else given the age of their blast furnaces and that everyone else is in electric-arc furnaces," Johnson said by

telephone. "This is going to cost them a lot of money and who's going to say they can catch up?"

\*\*\*

The quarterly results contrast those of the biggest U.S. steel producer, Nucor Corp. The Charlotte, North Carolina-based company painted a rosier picture for the current quarter, citing higher margins at its plate mills and increasing profitability in its downstream products. Nucor operates steelmaking furnaces that use scrap instead of iron ore as its main component, a process that uses less energy and is more efficient than the blast furnaces that U.S. Steel mostly relies on.

52.     Also reporting on the Company's surprisingly poor performance, Fox Business wrote:

U.S. Steel has been one of the leaders in lobbying for tariffs on steel imports, but it seems to have lost focus on its own business. While others were investing in improving technology and costs during the downturn, U.S. Steel was trying to save money and put off investments. That's coming back to haunt the company now and could lead to losses for years to come. Unless metals prices increase dramatically, I don't see a positive financial result ahead for the company. Thus, right now this is a stock I would stay away from, despite today's sell-off.

53.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired U.S. Steel securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, U.S. Steel securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by U.S. Steel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of U.S. Steel;

- whether the Individual Defendants caused U.S. Steel to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

24

- whether the prices of U.S. Steel securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- U.S. Steel securities are traded in an efficient market;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold U.S. Steel securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of U.S. Steel securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire U.S. Steel securities and options at artificially inflated prices.  In furtherance

of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

66.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for U.S. Steel securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about U.S. Steel's finances and business prospects.

67.    By virtue of their positions at U.S. Steel, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of U.S. Steel, the Individual Defendants had knowledge of the details of U.S. Steel's internal affairs.

69.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of U.S. Steel.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to U.S. Steel's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of U.S. Steel securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning U.S. Steel's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired U.S. Steel securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

70.    During the Class Period, U.S. Steel securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of U.S. Steel securities at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of U.S. Steel securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of U.S. Steel securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

73.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.    During the Class Period, the Individual Defendants participated in the operation and management of U.S. Steel, and conducted and participated, directly and indirectly, in the conduct of U.S. Steel's business affairs.  Because of their senior positions, they knew the adverse non-public information about U.S. Steel's misstatement of income and expenses and false financial statements.

75.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to U.S. Steel's financial condition and results of operations, and to correct promptly any public statements issued by U.S. Steel which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which U.S. Steel disseminated in the marketplace during the Class Period concerning U.S. Steel's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause U.S. Steel to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of U.S. Steel within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of U.S. Steel securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of U.S. Steel.  By reason of their senior management positions and/or being directors of U.S. Steel, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, U.S. Steel to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of U.S. Steel and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by U.S. Steel.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustain by Plaintiff and the Class by reason of the acts and transgressions herein alleged;

C.      Awarding the Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

The Plaintiff respectfully demands trial by jury on all issues so triable.

Dated:  **May 19, 2017**                              Respectfully submitted,

**Vincent A. Coppola, Esquire**
Penn. Attorney #50181

PRIBANIC & PRIBANIC
513 Court Place
Pittsburgh, PA  15219
(412) 281-8844

*Attorney for plaintiff*

**Jeremy A. Lieberman, Esquire**
**J. Alexander Hood, II**
**Hui Chang**

POMERANTZ, LLP
600 Third Avenue - 20th Floor
New York, NY  10016
(212) 661-1100

jalieberman@pomlaw.com
ahood@pomlaw.com
hchang@pomlaw.com

*Of Counsel for plaintiff*

**Patrick V. Dahlstrom**

POMERANTZ, LLP
Suite 3505
10 South La Salle Street
Chicago, IL  60603
(312) 337-1181

pdahlstrom@pomlaw.com

*Of Counsel for plaintiff*


**Peretz Bronstein**

BRONSTEIN, GEWIRTZ & GROSSMAN, LLP
Suite 4600
60 East 42nd Street
New York, NY  10165
(212) 697-6484

peretz@bgandg.com

*Of Counsel for plaintiff*